IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LARRY D. HARRIS, JR.,

                Plaintiff,

    v.                                                                                                OPINION and ORDER

PETAR KARNA, BRADLEY R. JAHNKE,                     21-cv-133-jdp
and DANE KIRK,

                Defendants.[1]

---

    Plaintiff Larry D. Harris, Jr., appearing pro se, is a prisoner at Waupun Correctional Institution. Harris alleges that when he was incarcerated at Columbia Correctional Institution, correctional officers injured him by placing him in tight handcuffs and refusing to loosen them. Harris brings claims under the Eighth Amendment to the United States Constitution. Defendants have filed a motion for summary judgment, Dkt. 31, which I will deny because there are genuine disputes of material fact concerning the events at issue and Harris's injuries. The case will proceed to trial.

UNDISPUTED FACTS

    The following facts are undisputed unless otherwise noted.

    Plaintiff Larry D. Harris, Jr. was incarcerated at Columbia Correctional Institution (CCI). Defendants worked at CCI: Petar Karna was a lieutenant and Bradley Jahnke and Dane Kirk were correctional officers. Harris brings claims about defendants' refusal to loosen his

---

[1] I have amended the caption to reflect the spellings of defendants' names as provided in their submissions.

overly tight handcuffs at the end of a series of events occurring after Harris assaulted a correctional officer. The events leading up to the handcuffing at issue bear some relevance to Harris's claims, so I begin with the assault.

**A.  Background**

At about 8:15 a.m. on February 18, 2016, Harris attacked a correctional officer who he was conversing with. The assault lasted about 40 seconds; Harris struck the officer with a closed fist about a dozen times, put his arms around the officer's neck, knocked him to the floor, and kicked him.

Harris walked away from the officer. Security staff entered the unit to restrain Harris. Defendants state that Harris resisted staff and kicked at them. Harris states that he did not resist the officers. Video footage of the assault and aftermath does not show whether Harris resisted: Harris's body is largely blocked from the view of one of the cameras by the large number of officers who responded to the scene, and the officers' restraint of Harris was outside the view of the other camera. *See* Dkt. 34-3 and 34-4 (placeholder entries for video footage from two cameras).

Defendant Karna twice fired a taser to Harris's right shoulder and left thigh. Another officer fired a second taser to Harris's thigh, but Karna stopped the taser cycle short because officers were able to handcuff Harris by that point. Defendants say that it was necessary to tase Harris to gain his compliance; Harris says that he was already compliant.

Karna called for a "restraint chair," which prison policy allows for transport of "highly assaultive or out-of-control inmates." Dkt. 34-1, at 6. A restraint chair is built with a groove to provide space for an inmate's hands handcuffed behind his back. Once Harris had been secured

into the restraint chair, security staff escorted Harris to be strip searched, secured in a bed restraint, and placed in a control cell.

As he was escorted to the observation shower, Harris stated that he was asthmatic and could not breathe, and he asked for his inhaler. Karna told him that medical staff had been alerted and his inhaler would be retrieved as soon as possible.

Staff arrived with Harris at the observation shower to conduct a strip search, helped Harris to his feet, and escorted him toward the shower. Defendants say that Harris lunged toward the shower so they "stabilized" him against the door; Harris said that he did not lunge or resist the officers at any point. The strip search did not reveal any contraband. Non-defendant Nurse Beverly Veyna examined Harris and noted that he was not wheezing and that his lungs were clear. She noted a cut to his lip that did not need stitches. Officers put Harris back in the restraint chair and transported him back to the unit.

At the unit, Karna and other staff lifted Harris out of the restraint chair and placed him in a five-point bed restraint. Harris repeatedly stated that the restraints on his ankles were "way too tight" and he complained of his left hand being weak or numb. Dkt. 33, ¶ 25. Video of this part of the events shows that Karna loosened Harris's left ankle restraint, stating "that's a little too tight." Dkt. 34-5 (placeholder entry for the video recording), at 00:10. Harris says that Karna loosened the restraint only after Veyna told him to, but that is not reflected in the video, so I will accept defendants' proposed finding on this issue.

Nurse Veyna examined Harris further, cleaning his lip and giving him two puffs of his asthma inhaler. She and another nurse checked his restraints, concluding that they were not too tight even though Harris continued to say that they were.

3

**B. Handcuffing central to Harris's claims**

Harris's Eighth Amendment claims are about the following events.

It is unclear exactly how long Harris was in the restraint bed before the handcuffing that is the subject of Harris's Eighth Amendment claims. Defendants state that about two hours after the assault, defendant officers Jahnke and Kirk unrestrained Harris and took him out of the bed. Harris says that they took him out of the bed about an hour after the assault. It is undisputed that Jahnke and Kirk placed Harris in handcuffs and leg restraints, sat him in a restraint chair, and escorted him to a room in the segregation unit to be interviewed by two detectives from the Columbia County Sherriff's Department. Defendant Karna supervised the officers' placement of restraints.

After Jahnke applied the handcuffs Harris immediately complained to Jahnke about the tightness of the cuffs. Harris told Jahnke that he felt pain in his wrist and it felt like the handcuffs were so tight that they were breaking his wrists and cutting off blood circulation. Harris asked Jahnke if he could loosen the handcuffs but Jahnke ignored him. Harris then asked Karna if the handcuffs could be loosened but Karna ignored him.

On the way to the interview room, Harris continued to complain to defendants Jahnke and Kirk about the tightness of the handcuffs and he asked them to loosen the right handcuff because it felt like it was breaking his wrist, but they ignored him. Harris told them that he would refuse to cooperate with the interview unless they loosened the handcuff, but they ignored him.

The interview with the detectives lasted less than two minutes. Harris refused to tell the detectives his name or share his version of events. While he was being taken to another cell, Harris told Jahnke and Kirk that the handcuff on Harris's right wrist was so tight that his

4

hand felt numb. According to Harris, Jahnke told him "that [Harris] would have to deal with it because he was being transported to [Waupun Correctional Institution]." Dkt. 43, ¶ 48. Jahnke and Kirk then secured Harris in a room facing a wall to await transport. Harris says that he was left in the room for two hours; defendants say that it was about an hour.

When non-defendant officers arrived to transport Harris, they uncuffed him and Harris noticed "painful sores" on his right wrist and "long welts" on his left wrist from the handcuffs. *Id.*, ¶¶ 58, 59. The next day Harris saw a nurse and stated he had pain and numbness in his wrists. The nurse gave him ibuprofen for his pain. Staff reported that he had only light marks on his wrist that were "barely able to [be] visualize[d]." Dkt. 35-1, at 3.

Harris continued to have pain, muscle cramps, numbness, and stiffness in his right hand and wrist. In March 2016, about three weeks after the assault, a nurse examined Harris and noted no swelling or deformity in his right wrist and a range of motion within normal limits. A month after that, a doctor examined Harris and noted no swelling or loss of function but recommended a trial of physical therapy. The physical therapist noted that Harris "present[ed] with symptoms consistent with a distal radial nerve injury," that he had "mildly limited" flexion or range of motion in one of his fingers, and that "[h]e would benefit from a trial of PT services." *Id.* at 17. In July 2016, after several therapy sessions, the therapist concluded that any hand or wrist problem had "basically totally resolved." *Id.* at 6. Harris says that tingling pain, spasms, and numbness have since returned.

I will discuss additional facts as they become relevant to the analysis.

5

ANALYSIS

**A. Defendants' request to dismiss the case as a sanction**

In their reply brief, defendants ask me to dismiss the case as a sanction for what they say were "materially false" assertions by Harris in his summary judgment materials. Dkt. 49, at 1. In particular, they contend that the following two proposed findings of fact submitted by Harris are contradicted by an audio recording of Harris's interview with Columbia County detectives:

- "Upon entering the interview room Harris stated to the detectives that he did not want to make any statement because his wrist[s] are in pain."
- "When Jahnke and Kirk began to remove Harris from the interview room Harris told both he warned them he would not cooperate unless they loosen the handcuffs."

Dkt. 42, ¶¶ 39, 40. I allowed Harris to file a sur-reply addressing this issue.

This court has the inherent authority to sanction any party or counsel for abuse of the litigation process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991) (court may issue sanction when party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (internal quotations omitted)). "Though 'particularly severe,' the sanction of dismissal is within the court's discretion." *Montano v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008) (quoting *Chambers*, 501 U.S. at 45).

I will deny the motion to dismiss the case because defendants haven't shown that such an extreme sanction is warranted. As a starting point, inconsistencies in testimony are often a result of fallible human memory or other mistakes, not intentional perjury.

I'll start with the first of Harris's statements that defendants contend is false, Harris's statement that he did not want to talk to the detectives because his wrists were in pain. From the detective's audio recording, it is not easy to make out everything that Harris said during the short conversation.[2] But it is clear enough to conclude that he does not say that he "did not want to make any statement," nor did he explicitly state that his "wrists were in pain." Instead, he twice stated, "I can't feel my legs or my arms." Dkt. 51-1 (placeholder entry for the audio recording), at 00:50; 01:06. And he did not make any substantive statement about the assault: when asked for his name and DOC number, he stated, "You can get that from the C.O.," *id.* at 01:31, and he answered "no" when asked whether he wanted to talk to the detectives, *id.* at 01:36.

While the audio reveals that Harris did not make the precise statement in his proposed findings about refusing to speak to the detectives because his wrists hurt, the discrepancy is not large enough to conclude that Harris's inaccurate account was the result of anything other than fallible human memory. Harris's proposed finding accurately recounted the thrust of the conversation even if he was incorrect about the particulars. It is clear from the recording that Harris did not want to cooperate with the detectives, and one could reasonably infer from his recorded statement about being unable to feel his arms or legs that his restraints were causing the problem. And regardless, it is not clear that the discrepancy is material in the sense that Harris would gain an advantage from his written account being credited: the only real takeaway from either the audio or Harris's written account is that Harris contemporaneously stated that

---

[2] Harris objects to the recording, stating that defendants don't explain why type of recording device was used or how effective the device is as picking up distant voices. But defendants weren't required to do so and Harris doesn't challenge the authenticity of the recording.

7

his restraints caused him discomfort. I will credit the recorded account rather than Harris's proposed findings of fact where they conflict. But the discrepancy isn't enough to consider dismissing case.

That leaves Harris's second contested statement—that he told defendants Jahnke and Kirk that he would not cooperate unless they loosened the handcuffs. That statement occurred after the interview, so its absence on the recording fails to prove that Harris didn't say something after the recording ended or when he was out of the device's range. So I will continue to credit this statement in considering defendants' summary judgment motion.

Defendants argue in the alternative that "[w]hile these falsehoods might not necessarily warrant sanction, they call into question the remainder of Harris's claims that he loudly and repeatedly notified Defendants that the handcuffs were causing him injury." Dkt. 49, at 2. I take this to be an argument that no reasonable jury could believe any of Harris's other testimony if he was impeached with the audio recording of the detective interview. It isn't for this court to judge Harris's credibility at the summary judgment stage, and I cannot say as a matter of law that Harris's entire account of the relevant events is incredible because of the minor discrepancy at issue here. *See, e.g., Bergmann v. McCaughtry*, 65 F.3d 1372, 1378 (7th Cir. 1995) ("A minor inconsistency (if it may even be called an inconsistency) in an ancillary part of Trawitzki's testimony does not render the rest of her testimony incredible as a matter of law. Any inconsistency merely creates a credibility issue for the jury to resolve." (citation omitted)). So I will not dismiss the case. I will proceed to address the merits of defendants' motion for summary judgment.

**B. Merits**

I granted Harris leave to proceed on claims that defendants violated his Eighth Amendment rights by placing handcuffs on him so tightly that he sustained a nerve injury and refused to loosen them. Harris was restrained in various different ways during the events following his assault of a correctional officer, and defendants address more of those events than is necessary to respond to Harris's claims. His claims in this case are limited to the use of handcuffs as he was taken to a room to be interviewed by detectives and then to wait for transport to another prison. *See* Dkt. 9, at 3. (my order screening Harris's complaint). I will disregard argument by defendants directly regarding Harris's restraints before this part of the events.

The Eighth Amendment protects prisoners from cruel and unusual punishment, which includes the unnecessary and deliberate infliction of pain on a prisoner. *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009). When I screened Harris's complaint, I considered his claims under an "excessive force" theory, that is, "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

Defendants note that courts have been uncertain whether this standard is the correct one to use for tight-handcuff cases, or whether Harris's claims are more appropriately considered under what courts have termed the "deliberate indifference" standard: whether a defendant consciously disregarded a substantial risk of serious harm to a plaintiff complaining of pain from a condition of their confinement. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For instance, this court has previously noted that "the Court of Appeals for the Seventh Circuit has applied the excessive force standard in some cases involving restraints and the deliberate

9

indifference standard in other cases, without explaining the reason for choosing one standard over the other." *Ajala v. Tom*, No. 13-cv-102-bbc, 2015 WL 5009784, at *1 (W.D. Wis. Aug. 21, 2015), *vacated on other grounds*, 658 F. App'x 805 (7th Cir. 2016). But in its most recent relevant decision, the court of appeals concluded that "when the safety and security of other prisoners, staff, administrative personnel, and visitors is at issue, 'a deliberate indifference standard does not adequately capture the importance'" of competing security and prisoner-wellbeing interests. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 764 (7th Cir. 2021) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). So I will continue to apply the excessive force standard here.

The factors relevant to determining an excessive force claim include: (1) why force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether the defendant perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321.

Defendants address the second and third factors by contending that they did not use enough force to violate Harris's Eighth Amendment right against cruel and unusual punishment, stating that a "de minimis" use for force doesn't violate the Constitution. The discomfort typical of being handcuffed does not itself violate the Constitution when the use of handcuffs is warranted. *Cf. Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (officer did not violate Fourth Amendment when he applied handcuffs "somewhat too tightly" and plaintiff did not seek or receive medical care for any wrist injuries). And in the right circumstances, the lack of a serious injury can defeat a plaintiff's constitutional claim. *See Outlaw v. Newkirk*, 259 F.3d 833, 840 (7th Cir. 2001) (minor injury "supports the conclusion that the incident was 'at most . . . a de minimis use of force not intended to cause

10

pain or injury'"); *cf. Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("Lord's physical injuries consisted only of minor scratches, quickly and easily treated with a gauze bandage," not sufficient to demonstrate a cognizable harm).

But here there is a genuine dispute of fact over precisely how badly Harris was injured. Harris says that he had painful sores or welts on his wrists, that he had pain, cramps, stiffness, and numbness for months after the incident, and that some of those symptoms have returned several years after the incident. Defendants argue that there is no objective evidence supporting Harris's statements because contemporaneous DOC medical records state only that Harris had light marks or scratches and his providers generally noted no loss of function in his hands or other objective indications of injury. But at summary judgment, medical records do not disprove a plaintiff's own account of visible injuries or his subjective account of pain and numbness. And defendants concede that Harris was prescribed painkillers and physical therapy, which suggests that medical staff believed that he was indeed injured. The nature and length of the injuries that Harris describes are not so minor to entitle defendants to summary judgment on an argument that the use of force was de minimis.

As for the remaining factors, it is clear that Harris posed some degree of a security threat: he had violently assaulted a fellow officer without warning an hour or so before. But Harris's claims here are not about his restraint immediately following the assault, the more classic "heat of the moment" situation to which excessive force claims typically apply. Defendants' alleged excessive force here concerns their decisions not to temper their use of force by loosening Harris's restraints an hour or so later, even after they had ample time to consider and counter any security threat posed by addressing his repeated complaints of severe

11

pain and numbness. And—at least according to Harris—he was compliant with officers during his initial restraint and entire time afterward.

In their brief, defendants state that "Harris's complaints were reasonably perceived by Defendants as an attempt to loosen them in a way that would jeopardize security." Dkt. 32, at 17. But none of the defendants provide testimony or other evidence stating that this was the reason that they refused to loosen the handcuffs. They also don't explain how serious of a threat they perceived him to be at the relevant times, and they don't explain how dangerous it would have been for them to temper their use of force by adjusting the handcuffs. Because this case involves an hours-long stretch of time that Harris says he spent in pain rather than only a "heat of the moment" interaction, it is reasonable to infer that defendants could have figured out a method to adjust the handcuffs without exposing themselves to danger. At the summary judgment stage I must resolve all factual disputes in Harris's favor and draw all reasonable inferences from the facts in his favor. I cannot assume that defendants kept Harris handcuffed so tightly for security reasons.

Harris states that Jahnke and Kirk handcuffed him too tightly, failed to do anything about it even after he complained about severe pain multiple times, and Jahnke told him "that he would have to deal with it" because he was being transported to another prison. A reasonable juror could infer from these facts that Jahnke and Kirk maliciously kept him painfully restrained, so Jahnke and Kirk are not entitled to summary judgment on the merits of Harris's excessive force claims against them.

As for defendant Karna, he states that Harris continued to resist restraints at various times after the assault (although not during the time he was handcuffed by defendants Jahnke and Kirk). But according to Harris, he was compliant with the officers who restrained him, yet

12

Karna tased him anyway and then later refused to intervene when he complained of Jahnke and Kirk's handcuffing. Harris's excessive force claim against Karna is not about the unnecessary tasing but it does provide insight into whether Karna acted maliciously toward Harris. Defendants point to other evidence countering Harris's contention that Karna acted maliciously toward him: video shows that Karna loosened one of Harris's bed restraints before Jahnke and Kirk handcuffed him, and it's undisputed that Karna helped to get Harris asthma medication when Harris complained about his breathing. But that isn't enough for me to rule for Karna as a matter of law: a reasonable jury could still conclude on this evidence that Karna participated in the excessive force by refusing to loosen Harris's handcuffs. So Karna is not entitled to summary judgment on the merits of Harris's excessive force claim either.

## C. Qualified immunity

Regardless the merits of Harris's claims, defendants contend that they are entitled to summary judgment under the doctrine of qualified immunity. This doctrine shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Defendants concede that "[i]t is settled law that 'an officer may not knowingly use handcuffs that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury.'" Dkt. 32, at 17 (quoting *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)). But they argue that cases like *Stainback* don't apply here because Harris had assaulted an officer and thus posed a threat to them. Defendants go so far as to argue that one might infer from *Stainback's* holding that "an officer *may* knowingly inflict unnecessary pain on someone who poses a threat." *Id.* at 18 (emphasis in defendants' brief).

I will reject the argument that case law *allows* officers to inflict unnecessary pain as plainly contrary to the Eighth Amendment, which prohibits the infliction of unnecessary pain in a variety of contexts, including excessive force cases. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 737 ("This punitive treatment amounts to gratuitous infliction of 'wanton and unnecessary' pain that our precedent clearly prohibits."); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("[c]onditions [of confinement] must not involve the wanton and unnecessary infliction of pain"); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (delaying medical treatment may violate Eighth Amendment "if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain").

Regardless, the disputed facts here could lead a jury to conclude that defendants' actions fit within *Stainback's* analysis prohibiting the infliction of unnecessary pain against someone posing "little or no risk of flight or threat of injury." *See Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021) (court should not grant summary judgment on qualified immunity grounds where "determining whether [defendant's] violation of [plaintiff's] rights was clearly established . . . requires findings of fact"). Arrestees, pretrial detainees, and prison inmates are often restrained by officers for obvious reasons: most to all of them pose *some* degree of flight

14

or assault risk. Many of them are arrested or convicted of crimes even worse than the alarming assault captured on video here. But any reasonable officer would know that this doesn't give the officer a perpetual green light to inflict unnecessary pain even after the initial threat of violence has passed.

Drawing all inferences in Harris's favor, defendants intentionally kept the tight handcuffs on Harris despite knowing that he was in severe pain even after he had been compliant with officers' directives and even though they had time to consider how to safely adjust the cuffs. *See Mitchell v. Krueger*, 594 F. App'x 874, 877 (7th Cir. 2014) (vacating grant of summary judgment for defendants because reasonable juror could find that, while defendant officers were justified in using some force to restrain an inmate who had started a fight, they continued to exert force "for no reason except to cause him pain," even after the inmate was no longer "a threat to anyone."). Because the disputed facts could fit within clearly established excessive force law, I will deny defendants' motion for summary judgment on qualified immunity grounds, and this case will proceed to trial.

### D. Recruitment of counsel

Harris has filed a motion for appointment of counsel, which I will deny without prejudice. Litigants in civil cases do not have a constitutional right to counsel, and I do not have the authority to appoint counsel to represent a pro se plaintiff in a civil matter. Rather, I can only assist in recruiting counsel who may be willing to serve voluntarily. *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007) (en banc). To show that it is appropriate for the court to recruit counsel, a plaintiff must meet three requirements. *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010). First, Harris must show that he is

unable to afford counsel. The financial information that he has submitted is sufficient to meet this requirement.

Second, a plaintiff must show that he has made reasonable efforts to locate an attorney on his own. *See Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1072–73 (7th Cir. 1992) ("the district judge must first determine if the indigent has made reasonable efforts to retain counsel and was unsuccessful or that the indigent was effectively precluded from making such efforts"). This court ordinarily requires a plaintiff to contact at least three attorneys before seeking help from the court. Harris has submitted correspondence showing that he has contacted three lawyers, one of which told him that his firm's practice is to take these types of cases only when asked to do so by the court. *See* Dkt. 55-1. Harris seems to be arguing that this shows that this firm is interested in taking his case but is waiting for the court's approval. That is not a reasonable interpretation of the letter—the firm is not indicating its desire to take on representation.

Harris's motion fails on the third part of the analysis: this court recruits counsel for a pro se litigant only when the litigant demonstrates that his case is one of those relatively few in which it appears from the record that the legal and factual difficulty of the case exceeds his ability to prosecute it. *Pruitt*, 503 F.3d at 654–55.

Harris argues that the case will come down to a credibility contest. That may end up being true, but that is common in cases brought by pro se parties and the court cannot recruit counsel for all of them at trial. Harris has litigated other cases in this court up to the summary judgment stage, and from his filings in those cases and this one, he appears to be fully capable of litigating the trial pro se. Harris also states that the hand that he writes with remains injured to some degree, with spasms and stiffness that "make[] it hard for him to write out documents,"

16

and that he has gotten help from other inmates. Dkt. 55, ¶ 6. But so far Harris has appeared to litigate his end of the case smoothly and there isn't reason to think that he is incapable of representing himself at trial. If he needs more time to accomplish pretrial tasks like submitting motions in limine or other materials, he can seek reasonable extension of those deadlines.

To help Harris prepare for trial, I will shortly issue a separate trial preparation order that provides detailed information about how trial works and how Harris should prepare. Harris should review the trial preparation order carefully and notify defendants' counsel or the court if he has specific questions about preparing for trial.

ORDER

IT IS ORDERED that:

1. Defendants' motion to dismiss the case as a sanction, Dkt. 49, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 31, is DENIED.

3. Plaintiff's motion for the court's assistance in recruiting him counsel, Dkt. 53, is DENIED without prejudice.

Entered November 17, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge